**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2056-20
                    A-2511-20

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

KWAMERE T. BENJAMIN,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

TYLER E. DRALLE,

      Defendant-Appellant.

_____

        Submitted (A-2056-20) and Argued (A-2511-20)
        November 15, 2023 – Decided November 4, 2024

        Before Judges Accurso, Vernoia and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 18-02-0233.

Joseph E. Krakora, Public Defender, attorney for appellant Kwamere T. Benjamin (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Grace C. MacAulay, Camden County Prosecutor, attorney for respondent in A-2056-20 (Kevin J. Hein, Assistant Prosecutor, of counsel and on the brief).

Robin Kay Lord argued the cause for appellant Tyler E. Dralle (The Law Office of Robin Kay Lord, attorneys; Robin Kay Lord, on the briefs).

Maura M. Sullivan, Assistant Prosecutor, argued the cause for respondent in A-2511-21 (Grace C. MacAulay, Camden County Prosecutor, attorney; Maura M. Sullivan, of counsel and on the brief).

The opinion of the court was delivered by

VERNOIA, J.A.D.

In these back-to-back cases we have consolidated for purposes of issuing a single opinion, defendants Kwamere T. Benjamin and Tyler E. Dralle appeal from their convictions and sentences for murder, felony-murder, robbery, burglary, and weapons offenses. Having considered their respective arguments, the record, and the applicable legal principles, we affirm defendants' convictions, affirm Dralle's sentence, and vacate Benjamin's sentence and remand his case for resentencing.

2

I.

On June 25, 2017, Deanna Scordo was found shot and killed in the second-floor bedroom of the Winslow Township home she shared with her father, Anthony Scordo, Jr., on the family's blueberry farm.[1] Deanna had been shot three times, including once in the head at close range.

A Camden County grand jury later charged defendants in an indictment with the following offenses arising from the circumstances resulting in Deanna's death: second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1) (count one); second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count two); second-degree conspiracy to commit armed burglary, N.J.S.A. 2C:5-2 and 2C:18-2(a)(1) (count three); second-degree burglary, N.J.S.A. 2C:18-2(a)(1) (count four); first-degree armed robbery, N.J.S.A. 2C:15-1(a)(1) (count five); felony murder, N.J.S.A. 2C:11-3(a)(3) (count six); and purposeful or knowing murder, N.J.S.A. 2C;11-3(a)(1)-(2) (count seven).

Prior to defendants' joint trial on the charges, Dralle moved to suppress physical evidence—a supermarket receipt—seized from his car pursuant to a

---

[1] For convenience and clarity, we refer to individuals who share the same surname by their first names, intending no disrespect.

A-2056-20

search warrant and surveillance recordings from the supermarket that were obtained based on information gleaned from the receipt. After hearing argument, the court denied the suppression motion, finding the search warrant had been issued based on a sufficient showing of probable cause.

In a pretrial motion, Benjamin moved for severance of his trial from Dralle's. Dralle did not join in the motion. In part, Benjamin sought severance because Dralle's statements to the police had implicated Benjamin in the crimes charged. The court denied the motion on various grounds and ordered that the State could not during its case in chief reference or introduce in evidence Dralle's statements to the police implicating Benjamin.

The evidence presented at defendants' trial established that on June 25, 2017, Anthony had been asleep in his bedroom on the second floor of the family farmhouse when he was awakened at some point after 3:30 a.m. by a "scream" and "gunshots." Upon leaving his bedroom, he noticed second-floor lights were on and he saw two men running down the stairs.

Anthony called 9-1-1 after finding Deanna on the floor of her second-floor bedroom, where she had been shot. Anthony told the 9-1-1 operator that Deanna had been "shot twice" and he did not know if she was breathing. It was later determined Deanna had been shot three times; once in the chest and shoulder as

4

she laid in bed, and once with a very close-range shot to her head after she had fallen to the floor.

Anthony told the 9-1-1 operator that he had seen two males wearing "black hood[s]" running down the stairs, and they had run "out of the house." Anthony later discovered that money and weapons had been taken from the home. Anthony testified that two envelopes of cash—one containing $2,600 and the other containing between $2,100 and $2,300—had been taken from a kitchen cabinet and $276 in rolled coins had been taken from a first-floor bedroom. He also testified that two long guns—a rifle and shotgun—had been taken from the first floor.

Police arrived at the Scordo residence and found a screen door had been propped open with a cinderblock. The first floor had been ransacked, the kitchen cabinets were open, and papers were strewn over the kitchen counter. The police found Deanna's body face down "just inside her bedroom door." Two shell casings were found in the bedroom and a third casing was found in the hallway. The recovered casings "had been discharged by the same firearm." The cause of Deanna's death was later determined to be "multiple gunshot wounds."

Detectives interviewed Anthony. He reported he had previously been in a relationship with a woman, Tanya Bevins, whose children—Jacob Hayes and

Willimena Hayes—had begun working at the farm in 2016 and were employed at the farm at least through the day of Deanna's murder. According to Anthony, Bevins knew he kept money in the home's kitchen cabinets because he had given her money from the cabinets during their relationship. Detectives learned that Dralle was Willimena's boyfriend and often drove Jacob and Willimena to and from work at the farm. The police later interviewed Jacob multiple times, and Willimena and Bevins as well, but determined they had not provided any information resulting in helpful investigative leads.

On July 2 and 5, 2017, police spoke to Aliyah Saud, who reported that at a recent time—on a date that could have been Sunday, June 25, 2017, the date of Deanna's murder—she was in Dralle's car with Dralle, Jacob, Willimena, and a man named "Pat." Saud stated that between 8:00 and 9:00 p.m. Dralle had driven her and the other occupants to a house she believed was "Pat's." She explained that the three males, Dralle, Jacob, and Pat, had exited the car, Dralle went into the house and returned to the car with a white bag that contained what "looked to" her were papers and sneakers. She was told that what was in the bag was "life threatening" and needed to be burned quickly. Saud also informed police that Jacob had told her he had shot and killed Deanna.

A-2056-20

Police also interviewed Dralle's friend, Patrick Manganaro, who stated that on June 25, 2017, he was in a car with Dralle, Jacob, Willimena, and Willimena's female friend whom he did not know, and they went to his house where they had a bonfire in a fire pit. At trial, Manganaro testified he had gone into his house alone and, when he later exited, he saw bags in the bonfire but did not know who had put them there.

On July 3, 2017, detectives interviewed Dralle at the Winslow Township police headquarters. Dralle explained that he had been to the Scordo farm several times because he had driven his girlfriend Willimena and her brother Jacob to and from work at the farm in his 2014 charcoal-gray Dodge Dart.

Dralle stated that on June 24—the day prior to the murder—he had driven Jacob and Willimena to work and then played basketball with his friend Manganaro. Dralle said that at about 3:00 p.m. he went home and played video games and was "chilling with [his] sister." Dralle stated that he did not go out at all that night. He denied knowing anything about what had happened to Deanna and denied burning a bag.

On July 20, 2017, police interviewed Dralle's friend Michael Barner. Initially, Barner denied being at the Scordo residence on June 25, 2017, and told police that Dralle had confessed to him that he had been there. In another

7

statement he made on August 2, 2017, Barner told police that he been the driver of the car involved in the Scordo murder, but that Dralle was not there at all.

Barner also told the police that he had seen Benjamin at a gas station earlier in the day on June 24, 2017, and that Benjamin offered him $200 to $300 to give him a ride to a friend's house that night. According to Barner, when he got to Benjamin's house, Benjamin and one other person—not Dralle—got in the car and he drove them to the Scordo house. According to his statement to the police, Barner said he had heard gun shots at the house and, in response, drove away and left Benjamin and the other person at the house.

At the State's request, the court granted Barner use- and derivative-use immunity for his testimony at trial. Barner testified that on June 24, 2017, the day before the murder, he saw Benjamin who had asked if Barner would later drive him to a friend's house and had told Barner he would pay him to do so. Barner agreed and later spoke with Dralle, who said providing Benjamin with the requested ride was something they—Barner and Dralle—should do.

Barner testified that he then picked up Dralle and they went to Benjamin's residence to pick him up. According to Barner, when they arrived at the residence, Benjamin and another individual entered the vehicle, and Benjamin

A-2056-20

placed a gun to the back of Barner's head and told him to take them "where they needed to go, and not tell anyone."

Dralle directed Barner to drive to a home in Winslow Township that, as it turned out, was the Scordo residence. Barner testified that when they arrived at the home, the three passengers—Dralle, Benjamin, and the other man—were clad in black hoodies and exited the vehicle and ran to the back of the house. About fifteen to twenty minutes later, from his vantage point in the vehicle, Barner saw a second-floor bedroom light in the house turn on, heard a sound "like a shriek," and then heard "gunshots shortly after." Barner testified Dralle, Benjamin, and the other man then returned to the car, with Dralle and Benjamin carrying long guns, and Benjamin had "a bag that he wore."

Barner testified he then drove Benjamin and the other man back to Benjamin's residence, where Benjamin exited with the two long guns and the bag. Barner then dropped off Dralle at his residence and returned home.

Barner identified a photograph of the Scordo home. He also described and identified on a photograph where he had parked his car while waiting for Dralle, Benjamin, and the other man to return from the Scordo house. He pointed out the second-floor window where he had seen the light on prior to hearing the shriek and the gunshots. Other evidence presented established that

A-2056-20

the window he identified was in the bedroom in which Deanna had been shot and killed.

On cross-examination at trial, Barner testified he had lied in his initial statements to the police because he was scared and had tried to protect his friend, Dralle. Barner further acknowledged that on the evening of June 24, 2017, he had several phone calls with an individual identified as Dondre Benjamin, and two additional phone calls with Dondre at around 4:30 a.m. on June 25, 2017.[2] He also conceded that following Deanna's murder, he had conducted searches on the internet for "conspiracy to commit murder," "full immunity and means," and information on criminal defense attorneys.

Police also spoke with Loveuan Scott, who lived with Benjamin and Dondre, and is related to Benjamin through marriage. On July 19, 2017, while Scott was in custody on traffic warrants, he provided a video-recorded statement to police. During the statement, Scott said he had seen Dralle the previous day and Dralle had told him that police were looking for Benjamin and Dondre.

Scott reported that during June 2017, he had heard that "Benjamin is the one that did the bull shit," and he asked Benjamin what he had done. According to Scott, Benjamin said he had gone in the house and the "girl that died . . . did

---

[2] During trial, Benjamin was identified as Dondre's older brother.

some shit," and that he "had the gun," he "pulled the trigger," and "he had to do it." Scott also reported that Benjamin had said he got cash, "either twenty-three or thirteen" hundred and he had given Dondre $200.

Scott also stated that Benjamin had bought clothes and a "bunch of dumb shit" from the "[d]iamond store" at a mall and that Dondre had "FaceTim[ed]" him "flashing a lot of money" when he and Benjamin were at the mall. Scott also saw "quarter wraps" for rolling coins on the floor of their house "around the time . . . the shit first happened."

At trial, Scott testified in a manner inconsistent with the statement he had given police and otherwise disavowed the statements he had made to the police. The court admitted his recorded statement to the police as a prior inconsistent statement.

Police searched defendants' cell phones. Sergeant Chris Robinson, Commander of the Camden County Prosecutor's Office's High Tech Crimes Unit, testified about the Unit's use of Cellebrite software to extract information from cell phones. Another detective, who was unavailable at trial, had extracted information from Dralle's phone using Cellebrite and had generated an extraction report, which Robinson reviewed and testified had confirmed the extraction had been performed accurately. Detective Timothy Houck, who was

11

also employed in the High Tech Crimes Unit, testified that he had performed a Cellebrite extraction of Benjamin's phone, as well as an extraction using Axiom software. Houck also used Cellebrite and Axiom to perform an extraction on Dralle's cell phone.

Prosecutor's Office Detective Matthew Barber testified that the extraction of data from Dralle's phone for the period June 24 to 11:00 p.m. on June 25, 2017, demonstrated that Dralle had communicated with Willimena, Dondre, Barner and "Young Dom." During cross-examination by Benjamin's defense counsel, Detective Barber conceded that there were fourteen text messages between Dralle and Dondre from June 23 to June 25, 2017, and fifteen calls or attempted calls between them on June 24. A deleted message from Dralle to Dondre on June 23 states "what do you think for TN it's a go." Dralle then texted Dondre, "everything smooth" and Dondre responded, "yeah we just got to get Mike wheels." Dralle replied with a smiley face emoji and later wrote "life-changing." On June 24, Dralle texted Dondre, "we never seen money like this" and "but I'll see you tonight."

At 8:15:04 a.m. on June 25, five hours after Deanna's murder, Dralle received a text from "Pops" asking him where he was going, and he replied, "ShopRite." Later that day, Pops texted Dralle asking about a black hoodie on

12

the "back deck." Dralle responded, "it's mine." The search history on Dralle's phone revealed searches on June 25 and 26, 2017, that were deleted, for ".357 Sig." ".357 Magnum revolver" and ".357 rifle."

The extraction report of Benjamin's phone showed numerous searches of news sites from June 26 to 28, 2017. On June 28, the report showed searches for "New Jersey multiple head shots," "one injured in home invasion," "one injured in Hammonton, New Jersey," and "woman injured in Hammonton, New Jersey." There was a web search titled "Winslow woman gunned down at her home" and the date associated with the news article was June 25, 2017, at which time, as Detective Barber testified, only "very general ideas or very general details" about the murder had been released to the media. Also found on Benjamin's phone were various videos and photos showing him and Dondre with cash, including $100 bills and $20 bills, and at the Hamilton Mall.

Police searched Dralle's 2014 Dodge Dart pursuant to a warrant. In the car, police found a receipt for $90.78 from a Coinstar machine located at a ShopRite supermarket in Vineland. The receipt bore a date and time of June 25, 2017, at 8:27 a.m., hours after the murder. Dralle's fingerprints were found on the receipt. Police obtained surveillance video footage from the ShopRite from the date and time of the receipt, which showed a "gray car" pulling up to the

store and parking, and a person using the Coinstar machine whom the State asserted was Dralle.

Detectives also searched the Mays Landing home where Benjamin had been staying with Scott. They collected from a hallway closet an H&M shopping bag containing Footlocker and H&M receipts from the Hamilton Mall; a Verizon bag that had an Apple iPhone 5s box with a GoWireless receipt; and a Footlocker bag that contained an empty jewelry box and a black plastic bag containing another jewelry box, business cards and two receipts from Diamonds Forever. The receipts were dated from June 25 and 26, 2017. The GoWireless receipt stated was billed to Benjamin, and that he had paid $267.18 in cash. Benjamin's fingerprints were found on the iPhone box and the black plastic bag.

The jury convicted defendants on all the charges. The court sentenced Benjamin to an aggregate prison term of thirty-eight years with an eighty-five-percent period of parole ineligibility and a five-year period of parole supervision under the No Early Release Act, N.J.S.A. 2C:43-7.2 (NERA). On count one, second-degree unlawful possession of a handgun, the court imposed a seven-year term with a three-and-one-half-year period of parole ineligibility, under the Graves Act, N.J.S.A. 2C:43-6(c). The court merged count two, second-degree possession of a handgun for an unlawful purpose, into count five, first-degree

14

armed robbery, and merged count three, conspiracy, into counts four and six, second-degree burglary and felony murder. On count four, charging burglary, the court imposed a concurrent term of seven years with an eighty-five percent period of parole ineligibility under NERA, and a three-year period of parole supervision. On count five, charging robbery, the court imposed a concurrent term of fourteen years subject to the requirements of NERA. The court merged count six, charging felony murder, with count seven, charging murder, and imposed a concurrent term of thirty-eight-years subject to the requirements of NERA.

The court imposed the same sentences on Dralle on counts one, four and five, and made the identical merger decisions as to counts two, three and six. For Dralle's murder conviction, the court imposed a term of forty years subject to NERA's requirements. These appeals followed.

In A-2056-20, Benjamin offers the following arguments:

POINT I

> DEFENDANT WAS DENIED HIS RIGHTS TO A FAIR AND IMPARTIAL JURY BY THE TRIAL COURT'S ERRONEOUS DENIAL OF TWO JURY CHALLENGES FOR CAUSE, WHICH LED TO THE IMPANELING OF A JUROR WHO WOULD HAVE BEEN STRUCK BY THE DEFENSE HAD THE DEFENSE NOT BEEN FORCED TO EXHAUST ITS PEREMPTORY CHALLENGES.

15

POINT II

THE TRIAL COURT'S IMPROPER HANDLING OF THE JURY'S REQUEST TO HEAR A READBACK OF TESTIMONY FROM THE TWO MOST IMPORTANT WITNESSES IN THE CASE DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL.

POINT III

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A MISTRIAL WHERE THE COURT ERRONEOUSLY INFORMED THE JURY THAT SCOTT INVOKED HIS FIFTH AMENDMENT PRIVILEGE, LEAVING THE JURY WITH THE UNCORRECTED IMPRESSION THAT SCOTT FEARED CRIMINAL LIABILITY DUE TO HIS ASSOCIATION WITH DEFENDANT.

POINT IV

A THIRTY-EIGHT-YEAR NERA SENTENCE FOR THIS SEVENTEEN-YEAR-OLD DEFENDANT IS UNDULY PUNITIVE, MANIFESTLY EXCESSIVE, AND SHOULD BE REDUCED.

In A-2511-20, Dralle advances the following arguments:

POINT I

THE TRIAL COURT'S INTERFERENCE WITH JURY DELIBERATIONS CONSTITUTES REVERSIBLE ERROR.

16                                                              A-2056-20

POINT II

THE TRIAL COURT ERRED BY FAILING TO INQUIRE FURTHER AS TO THE JURY QUESTION TO SUBSTITUTE A SITTING JUROR WITH AN ALTERNATE JUROR.

POINT III

THE TRIAL COURT ERRED BY DENYING DEFENDANT'S MOTION TO SUPPRESS THE EVIDENCE SEIZED AS A RESULT OF THE EXECUTION OF A WARRANT FOR THE DEFENDANT'S CAR.

POINT IV

THE TRIAL COURT ERRED BY REFUSING TO GRANT A MISTRIAL.

POINT V

THE TRIAL COURT ERRED BY NOT SEVERING THE DEFENDANT'S TRIAL FROM THAT OF CODEFENDANT BENJAMIN[.]

POINT VI

THE PROSECUTOR COMMITTED MISCONDUCT DURING HIS SUMMATION THEREBY DEPRIVING THE DEFENDANT OF A FAIR TRIAL REQUIRING REVERSAL OF HIS CONVICTION.

POINT VII

THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING LAY TESTIMONY AS TO THE CELL

PHONE EXTRACTIONS USING CELLEBRITE WITHOUT CONDUCTING A <u>FRYE</u>[3] HEARING.

POINT VIII

THE TRIAL COURT'S JURY INSTRUCTIONS WERE DEFICIENT, DENYING DEFENDANT A FAIR TRIAL.

POINT IX

DEFENDANT IS ENTITLED TO A NEW TRIAL DUE TO CUMULATIVE ERROR.

POINT X

DEFENDANT'S SENTENCE IS EXCESSIVE.

Prior to addressing defendants' arguments, many of which are asserted for the first time on appeal, we note that we first consider the arguments concerning the court's disposition of pretrial motions, then address the court's alleged trial errors, and conclude with our analysis of defendants' respective challenges to their sentences.

## II.

Dralle challenges the court's denial of two pretrial motions. Dralle argues the court erred by denying his motion to suppress evidence—a receipt—seized from his vehicle and also the evidence—a video recording—derived from the

---

[3] <u>Frye v. United States</u>, 293 F. 1013, 1014 (D.C. Cir. 1923).

receipt. Dralle also argues the court erred in denying a motion he never made: Benjamin's motion for severance of his trial from Dralle's.[4] We consider Dralle's arguments in turn.

Dralle's Motion to Suppress Evidence

The police obtained a search warrant for Dralle's car and, during the subsequent search pursuant to the warrant, found a receipt from a coin cashing machine at a ShopRite supermarket showing that hours after Deanna's murder and the perpetrators' theft of $276 in rolled coins from the Scordo home, $90.78 in coins had been converted to cash. It was later determined Dralle's fingerprints were on the receipt and a surveillance recording from the supermarket showed a "gray" car parking at the store and a person who had exited the vehicle using the coin machine. The State argued Dralle was the individual who had exited the vehicle and used the coin machine at the time—8:27 a.m. on June 25, 2017— listed on the receipt.

The application for the warrant authorizing the search of Dralle's car was supported by an affidavit by Camden County Prosecutor's Office Detective Jason A. Rowello. The affidavit states in pertinent part that a juvenile, later identified as Saud, had informed the police that at approximately 6:00 p.m. on

---

[4] Benjamin does not argue the court erred by denying his severance motion.

June 25, 2017, she was in a black vehicle that had been identified as a 2014 Dodge Dart bearing a specified vehicle identification number (VIN). Saud also had reported that at that time she had been in the car with Dralle, Willimena, Jacob, and a man she identified as "Pat."

According to Detective Rowello's affidavit, Saud reported that the vehicle had been driven to a home in Buena Township and, after arriving there, Dralle, Jacob, and Pat, exited the vehicle and went into the home before returning to the vehicle with a white trash bag that appeared to contain footwear and papers. Detective Rowello further represented that the "bag was later described by Jacob as containing items of 'life or death' importance that were related to" Deanna's murder.

Detective Rowello also stated in his affidavit that Saud had reported that after Dralle, Jacob, and Pat re-entered the vehicle, it was driven to a separate residence where Jacob told Saud that "he had to wrestle with the female decedent at which time he shot her," and that he was upset because he knew the decedent's family. In the affidavit, Detective Rowello explained Saud had reported that once at the second address, the white "bag and its contents were . . . burned while" Saud "remained in the vehicle."

20

Detective Rowello also stated that based on those facts it was believed the black vehicle with the specified VIN contained evidence of the homicide. The detective further explained that based on the vehicle's VIN, it had been determined the vehicle was equipped with an Infotainment System, which is a device physically located in the vehicle that provides GPS information, communications data and evidence concerning the devices used by the vehicle's operator and occupants that would aid in the investigation of the murder.

The court denied Dralle's suppression motion, finding the affidavit's facts established probable cause for the vehicle search and rejecting Dralle's claim the affidavit's reliance on hearsay rendered the resulting warrant invalid. The court found it was reasonable to conclude that the vehicle contained evidence related to the murder because the affidavit established grounds to believe the vehicle had been used to transport evidence related to the crimes committed at the Scordo home. The court also rejected Dralle's assertion that the affidavit contained "material misrepresentations," noting that Dralle had failed to demonstrate the affiant had "deliberately lied or recklessly disregarded the truth" concerning any facts material to a probable-cause determination.

Dralle argues the court erred by denying his motion to suppress the evidence—the receipt—seized from the vehicle pursuant to the warrant issued

based on Detective Rowello's affidavit. He contends the court erred by relying on the information provided by Saud because she acted as a confidential informant and the affidavit did not include any facts establishing her reliability. Dralle also claims the search-warrant affidavit did not establish probable cause because it was based on hearsay and Detective Rowello lacked personal knowledge of the information in the affidavit because he was not one of the officers investigating Deanna's murder. Dralle further contends the affidavit did not establish a sufficient nexus between the vehicle and the murder to support probable cause for the search. Dralle last contends that the court should have conducted an evidentiary hearing before deciding the suppression motion.

In our review of an order denying a suppression motion, we defer to the court's factual findings that are supported by sufficient credible evidence and review its legal findings de novo. State v. Gamble, 218 N.J. 412, 424-25 (2014). Applying that standard, we find no error in the court's denial of Dralle's motion.

"A search that is executed pursuant to a warrant is 'presumptively valid,' and a defendant challenging the issuance of that warrant has the burden of proof to establish a lack of probable cause 'or that the search was otherwise unreasonable.'" State v. Boone, 232 N.J. 417, 427 (2017) (quoting State v. Watts, 223 N.J. 501, 513-14 (2015)). We therefore "accord substantial

deference to the discretionary determination resulting in the issuance of the [search] warrant[,]" ibid. (quoting State v. Jones, 179 N.J. 377, 388 (2004)), and evaluate only whether the application "provided sufficient evidence for [a] finding of probable cause to search the premises for the items authorized[,]" State v. Chippero, 201 N.J. 14, 32 (2009). By extension, a search warrant "must be supported by substantial evidence that the items sought are in fact seizable by virtue of being connected with criminal activity, and that the items will be found in the place to be searched." Boone, 232 N.J. at 427 (quoting Chippero, 201 N.J. at 28).

"New Jersey has adopted a totality-of-the-circumstances test to determine whether warrants are based on probable cause." State v. Gathers, 234 N.J. 208, 221 (2018). Probable cause exists where the facts and circumstances within an officer's "knowedge . . . [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is committed." State v. Moore, 181 N.J. 40, 46 (2004) (alterations in original) (quoting Schneider v.Simonini, 163 N.J. 336, 361 (2000)). "[T]he probable cause determination must be . . . based on the information contained within the four corners of the supporting affidavit, as supplemented by sworn testimony before the issuing

judge that is recorded contemporaneously."[5]  Boone, 232 N.J. at 427 (quoting State v. Marshall, 199 N.J. 602, 611 (2009)).

Additionally, "[t]here is no requirement that a warrant affidavit fully describe all steps taken, all information obtained, and all statements made by witnesses during the course of an investigation," State v. Smith, 212 N.J. 365, 398-99 (2012); see also State v. Kasabucki, 52 N.J. 110, 120 (1968) ("The affidavits presented to the court on the application should not be examined with a hypertechnical eye.").  The facts in a warrant affidavit "should not be reviewed from the vantage point of twenty-twenty hindsight by interpreting the supporting affidavit in a hypertechnical, rather than a commonsense manner."  State v. Sheehan, 217 N.J. Super. 20, 27 (App. Div. 1987).  And "when the adequacy of the facts offered to show probable cause . . . appears to be marginal, the doubt should ordinarily be resolved by sustaining the search" on appeal.  Kasabucki, 52 N.J. at 116.

Measured against these principles, we find no error in the court's issuance of the warrant or in the motion court's rejection of Dralle's challenge to it.  The information contained in the four corners of the affidavit explains that Saud had

_____

[5]  The record does include any evidence establishing that Detective Rowello supplemented the warrant affidavit with testimony before the judge who issued the search warrant.

informed the police that on the same day as Deanna's murder, she was in a black vehicle with Dralle, Jacob, Willimena, and Pat that the police had later identified with a specified VIN.

As explained in the affidavit, Saud had reported that while in the vehicle, Jacob stated he had shot Deanna and that the items in the bag were "items of 'life or death' importance and were related to" the murder. Saud had also reported the items in the bag had been transported to a different location and had been burned. The affidavit further explained that based on information gleaned from an investigation, it had been determined the vehicle contained a computer system that would provide information, including GPS data, that would allow a determination as to the places the vehicle had traveled.

In our view, the affidavit included sufficient facts supporting a reasonable belief the specified vehicle contained evidence related to Deanna's murder and the other crimes committed at the Scordo home. Kasabucki, 52 N.J. at 116. The information provided by Saud supported a reasonable belief evidence related to the murder had been obtained from one residence and was then transported in the bag in the vehicle to another residence where it was burned. Indeed, Saud had reported that Jacob admitted as much. Moreover, the affidavit established a reasonable basis to conclude the vehicle's Infotainment system might provide

25

evidence concerning the timing of the movement of evidence related to the murder, the places where the evidence had been located and was reportedly destroyed, and data concerning communications made by the vehicle's occupants. Boone, 232 N.J. at 427.

Dralle argues that Saud's statements "did not establish" that the vehicle was his car. However, the warrant affidavit does not describe the vehicle as Dralle's vehicle. It identifies the vehicle by its VIN and explains that the vehicle had been identified as having the listed VIN.

Dralle also argues the information contained in the warrant affidavit was provided by Saud who "acted more as a confidential informant than as a truly concerned citizen," and therefore the information required independent corroboration by the police. Dralle contends that Saud's statements to police prior to the search-warrant application were vague and nonspecific and did not support the statements made in the warrant affidavit and therefore required that the court hold an evidentiary hearing to determine their truthfulness.

"Our courts have distinguished between an identifiable citizen, who is presumed to be reliable, and an anonymous informer whose reliability must be established." State v. Basil, 202 N.J. 570, 586 (2010); see also State v. Keyes, 184 N.J. 541, 556 (2005) (finding statements made by informants require

"independent police corroboration" to establish their reliability).  Thus, "information imparted by a citizen directly to a police officer will receive greater weight than information received from an anonymous tipster" and "an objectively reasonable police officer may assume that an ordinary citizen reporting a crime, which the citizen purports to have observed, is providing reliable information."  Ibid.  When the hearsay contained in a search-warrant application comes from statements made by a criminal or an anonymous informant, "thorough scrutiny of the informant's veracity and basis of knowledge in the context of the totality of the facts contained in the officer's showing of probable cause" is required.  State v. Novembrino, 105 N.J. 95, 123 (1987) (citing Illinois v. Gates, 462 U.S. 213, 238-39 (1983)).

The court properly relied on Saud's statements, as reported by Detective Rowello, in making its probable-cause determination for the search warrant. Dralle's claim Saud acted as a confidential informant is bereft of support in the record.  Dralle alleges the police must have engaged in off-the-record conversations with Saud and the police must have "intended to help her out," but the claim is based on speculation untethered to any evidence.  There is also no evidence Saud's communications with police were motivated by personal gain, thereby requiring independent corroboration of her statements before they

could serve as an adequate basis for issuance of the warrant. See Keyes, 184 N.J. at 556.

Probable cause for a warrant may be established by statements, including hearsay statements, see Gathers, 234 N.J. at 221, made by citizen-informants, because unlike criminal-informants or anonymous informants, a concerned citizen "does not expect any gain or concession in exchange for his [or her] information," Widoner v. Borough of Ramsey, 162 N.J. 375, 391 (2000) (quoting State v. Lakomy, 126 N.J. Super. 430, 435 (App. Div. 1974)), but rather is "motivated by factors which are consistent with law enforcement goals[,]" ibid. (quoting Sanducci v. City of Hoboken, 315 N.J. Super. 475, 482 (1998)). That is what occurred here. Saud reported to the police that Jacob had stated he was involved in the murder and that the vehicle Dralle had driven contained evidence, later burned, related to the murder. That information supported the court's determination there was probable cause to search the vehicle. See Novembrino, 105 N.J. at 110 (noting the "entrenched principle" that "hearsay alone can provide a sufficient basis for [a] warrant").

Moreover, the information provided by Saud included facts that established an "appearance of trustworthiness," State v. DiRienzo, 53 N.J. 360, 385 (1969), of the information she had provided. The affidavit states that Saud

admitted she had been an eyewitness to the transport of evidence related to the murder and the details she provided, including her report of the statements made by Jacob, are consistent with other information included in the affidavit. For example, the affidavit notes the police investigation revealed that Deanna had been shot, and Saud reported that Jacob admitted he had shot her. In sum, Saud's statements were sufficiently trustworthy to establish an adequate nexus between the vehicle and evidence of the crimes committed at the Scordo home.

Dralle also argues the search-warrant affidavit was inadequate because Detective Rowello "had no connection to the investigation of the murder" and therefore could not attest to the accuracy of the "personal information of the facts" in the affidavit. In evaluating an affidavit for a search warrant, probable cause often arises from "'the total atmosphere of the case'" based upon "the affiant's personal knowledge, or information received from other law enforcement officers or reliable informers[.]" State v. Tanzola, 83 N.J. Super. 40, 46 (App. Div. 1964) (quoting United States v. Bell, 126 F. Supp. 612, 615 (D.D.C. 1995)).

Detective Rowello was assigned to the Homicide Unit of the Camden County Prosecutor's Office—the same unit primarily responsible for investigating the murder. In his affidavit, Detective Rowello described his

29

employment with the unit and explained he was responsible for the investigation of the murder and had otherwise "conducted and assisted in numerous investigations" for the unit. We are satisfied the detective established a sufficient basis for his knowledge of the facts in the affidavit—that of an officer, involved in the investigation and within the unit primarily handling the same investigation—to adequately provide a basis for the judge's finding of probable cause for the search warrant. Ibid.; see Gathers, 234 N.J. at 223 (finding an "affidavit from a police officer familiar with the investigation" is the preferred means of support for an application seeking a buccal swab of the defendant).

Dralle also argues he was entitled to a Franks[6] hearing, claiming Detective Rowello had falsely stated in his affidavit that the Dodge vehicle was "black" and otherwise omitted material facts which, if included in the affidavit, "would have caused the issuing judge to refuse to sign the warrant." We are unpersuaded.

A Franks hearing is required "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of

---

[6] Franks v. Delaware, 438 U.S. 154 (1978).

probable cause."  438 U.S. at 155-56.  A defendant seeking a <u>Franks</u> hearing

"must allege 'deliberate falsehood or reckless disregard for the truth,' pointing

out with specificity the portions of the warrant that are claimed to be untrue."

<u>State v. Howery</u>, 80 N.J. 563, 567 (1979) (quoting <u>Franks</u>, 438 U.S. at 171).  To

obtain a <u>Franks</u> hearing, a defendant must support his or her allegations with

affidavits or other reliable statements because "[a]llegations of negligence or

innocent mistake are insufficient."  <u>State v. Broom-Smith</u>, 406 N.J. Super. 228,

241 (App. Div. 2009) (quoting <u>Franks</u>, 438 U.S. at 171).

A defendant must also demonstrate that absent the alleged false

statements, the search warrant lacks sufficient facts to establish probable cause.

<u>Howery</u>, 80 N.J. at 568.  If a search-warrant affidavit contains sufficient facts

establishing probable cause even after the alleged false statements are excised,

a <u>Franks</u> hearing is not required.  <u>Franks</u>, 438 U.S. at 171-72.

A misstatement is considered material if, when excised, the warrant

affidavit "no longer contains facts sufficient to establish probable cause" in its

absence.  <u>Howery</u>, 80 N.J. at 568 (citing <u>Franks</u>, 438 U.S. at 171).  "If at such

inquiry the defendant proves [a] falsity by a preponderance of the evidence, the

warrant is invalid and the evidence seized thereby must be suppressed."  <u>Id.</u> at

566; <u>see also</u> <u>Franks</u>, 438 U.S. at 172 (holding "when material that is the subject

31

of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required").

We reject Dralle's claim Detective Rowello omitted from his affidavit facts material to a determination of probable cause for the search. Dralle does not identify any such facts. See Howery, 80 N.J. at 567. We also reject Dralle's claim the affidavit included a material misstatement of fact—allegedly that the Dodge vehicle was black—based on his claim that his vehicle was gray. Even accepting that the vehicle was gray and not black, the color of the car was not material to the probable-cause determination. The vehicle in which Saud stated she had been driven was otherwise identified by its VIN number and, as a result, the vehicle's color was not a fact material to the probable-cause determination required for the warrant.

As we have explained, where probable cause exists despite what is claimed to be errant information in a search-warrant affidavit, the search warrant remains valid and a Franks hearing is not required. Sheehan, 217 N.J. Super. at 25. Dralle offers no evidence the alleged misstatement about the color of the vehicle—or any other alleged omission in the warrant affidavit pertaining to Saud's statements to the police—was deliberately false or "made in reckless

disregard of the truth" such that he was entitled an evidentiary hearing. Howery, 80 N.J. at 567; Broom-Smith, 406 N.J. Super. at 240 (noting "a Franks hearing is not directed at picking apart minor technical problems with a warrant application; it is aimed at warrants obtained through intentional wrongdoing by law enforcement agents"). The motion court therefore correctly determined Dralle had not demonstrated an entitlement to a Franks hearing and properly denied his suppression motion as to the evidence seized from the vehicle and the derivative evidence—the video recordings—subsequently seized from the supermarket.

Dralle's Claim The Court Erred By Denying Benjamin's Severance Motion

As noted, Dralle did not move to sever his trial from Benjamin's and he did not join in Benjamin's severance motion. Nonetheless, and having never requested severance from the trial court, Dralle argues for the first time on appeal he was entitled to severance and the court erred by denying Benjamin's severance motion because defendants presented antagonistic defenses.

In the first instance, we reject Dralle's claim because it was not made before the trial court and does not "go to the jurisdiction of the trial court or concern matters of great public interest." State v. Robinson, 200 N.J. 1, 20 (2009) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).

Dralle's failure to move for severance based on the arguments he makes for the first time on appeal "denied the trial court the opportunity to evaluate the claim in an informed and deliberate manner" and deprives this court of "the benefit of a robust record within which [his particular] claim[s] could be considered."  Id. at 21.  For those reasons alone, we reject Dralle's claim he was entitled to a severance he did not request the court grant in the first instance.

Nonetheless, for purposes of completeness, we consider and reject Dralle's newly-minted claim that he was entitled to severance of his trial from Benjamin's.  We consider the argument under the plain-error standard and will reverse his conviction only if the court made an error "clearly capable of producing an unjust result."  State v. Burns, 192 N.J. 312, 341 (2007) (citing R. 2:10-2); see also State v. Singh, 245 N.J. 1, 13 (2021) (explaining "[w]hen a defendant does not object to an alleged error at trial, such error is reviewed under the plain error standard").

"'The test for granting severance . . . is a rigorous one,'" State v. Brown, 170 N.J. 138, 160 (2001) (quoting State v. Brown, 118 N.J. 595, 605-06(1990)), under which the court "must balance the potential prejudice to a defendant against the interest in judicial economy," ibid.  As a rule, "[j]ointly indicted defendants generally should be tried together to avoid unnecessary, duplicative

litigation[,]" <u>State v. Sanchez</u>, 143 N.J. 273, 281-82 (1996), because often in those instances, "the crimes charged arise from the same series of acts" and "much of the same evidence is needed to prosecute each defendant[,]" <u>Brown</u>, 118 N.J. at 605; <u>see also</u> <u>State v. Gaskin</u>, 325 N.J. Super. 563, 575 (App. Div. 1999) ("The joint trial creates efficiency in the judicial process, is convenient to witnesses and victims, avoids inconsistent verdicts, and is more accurate in the assessment of relative culpability.").

A separate trial is required when codefendants' defenses are "antagonistic and mutually exclusive or irreconcilable." <u>Brown</u>, 118 N.J. at 605. More particularly, "[s]eparate trials are required only when defendants 'present defenses that are antagonistic at their core[,]'" <u>id.</u> at 606 (quoting <u>United States v. Berkowitz</u>, 662 F.2d 1127, 1134 (5th Cir. 1981)), and "[t]he mere existence of hostility, conflict, or antagonism between defendants is not enough" to justify severance, <u>ibid.</u> "'Mutual exclusivity' demands that the jury's universe of choices be limited to two: the jury can believe only either one defendant or the other." <u>Ibid.</u> Stated differently, the State's "theory of the case, and the defenses themselves, must force the jury to choose between the defendants' conflicting accounts and to find only one defendant guilty[,]" and as such, "[i]f the jury can return a verdict against one or both defendants by believing neither, or believing

portions of both, or, indeed, believing both completely, the defenses are not mutually exclusive." Ibid. Nor does the "fact that one defendant seeks to escape conviction by placing guilt on his or her co-defendant" constitute "sufficient grounds for severance." Ibid.

Dralle claims that Benjamin's defense at trial was, in part, to place the blame for the murder on Dralle, which Dralle claims directly hindered his own defense that he was not present during the murder. We find no merit to the argument. Benjamin's attempt to shift guilt onto Dralle—or Dralle's shifting of guilt onto Benjamin—does not constitute grounds requiring severance of trials. Ibid.

Nor do we otherwise find that defendants should not have been tried together based on the existence of mutually exclusive defenses. Ibid. Dralle argues defendants' defenses were mutually exclusive, and thereby antagonistic, by inaccurately claiming that if the jury accepted Benjamin's defense, it would have to convict Dralle, or that if the jury accepted Dralle's defense, it would have to convict Benjamin. The argument's premise is false. The jury could have accepted both Dralle's and Benjamin's version of the events and, on that basis, concluded that neither was involved in the murder. And, evidence supporting a jury determination that both defendants were not guilty establishes that

defendants' defenses were not mutually exclusive, id. at 607, such that the trial court should have sua sponte severed their trials or granted Benjamin's severance motion. We therefore find no plain error in the court's decision to hold defendants' trial jointly. R. 2:10-2.

III.

We next address defendants' respective and joint claims the court committed errors during trial.

<u>Juror Challenges</u>

Benjamin asserts he was deprived of his right to a fair trial by the court's denial of his request to excuse two jurors for cause: juror number 739 (juror 739) and juror number 700 (juror 700). Benjamin argues that as a result of the court's denial of his requests to excuse those jurors for cause, he was obliged to exhaust his peremptory challenges by excusing those jurors and thus "was unable to excuse an impaneled juror who would have been struck by the defense."

"'Trial courts possess considerable discretion in determining the qualifications of prospective jurors,' which stems from the 'inability of appellate courts to appreciate fully the dynamics of a trial proceeding.'" State v. Simon, 161 N.J. 416, 465-66 (1999) (quoting State v. DiFrisco, 137 N.J. 434, 459

37

(1994)); see also State v. Papasavvas, 163 N.J. 565, 595 (2000) (quoting State v. Jackson, 43 N.J. 148, 160 (1964)) ("Voir dire procedures and standards are traditionally within the broad discretionary powers vested in the trial court and 'its exercise of discretion will ordinarily not be disturbed on appeal.'").  As such, in our analysis of Benjamin's claim, we determine "only . . . whether 'the overall scope and quality of the voir dire was sufficiently thorough and probing to assure the selection of an impartial jury.'"  State v. Winder, 200 N.J. 231, 252 (2009) (quoting State v. Biegenwald, 106 N.J. 13, 29 (1987)).

A prospective juror should be excused for cause if the trial court determines, in its "discretion, the juror's beliefs or attitudes would substantially interfere with his or her duties."  Simon, 161 N.J. at 465 (quoting State v. Harris, 156 N.J. 122, 168 n.3 (1998)).  "The party challenging the juror must demonstrate that 'the juror's view would prevent or substantially impair the performance of that juror's duties in accordance with the court's instructions and the juror's oath.'"  Ibid. (quoting DiFrisco, 137 N.J. at 469; State v. Ramseur, 106 N.J. 123, 255 (1987)).

Where, as here, a defendant argues he was forced to exercise his preemptory challenges because the court erred by failing to excuse jurors for cause, he "must demonstrate that a [partial] juror" participated in deliberations

"as a result of . . . [his] exhaustion of peremptories."  DiFrisco, 137 N.J. at 470.

To demonstrate that error, the defendant must show:

> (1) that the trial court erred by failing to remove a juror for cause; (2) that the juror in question was eliminated by the exercise of defendant's peremptory challenge and that defendant exhausted his remaining challenges; and (3) that at least one of the remaining jurors that sat on the jury was a partial juror.
>
> [Id. at 469.]

Benjamin challenges the court's refusal to dismiss juror 739 for cause, arguing the juror should have been excused because he had previously been a crime victim.  Benjamin claimed the juror could not perform his duties in an unbiased manner and had otherwise purportedly struggled to understand the applicable burden of proof.  The court rejected the argument, finding the juror had "satisfied" the court he understood the burdens of proof and that the juror was "truthful" in stating his prior experience as a crime victim "wouldn't have a bearing on his ability to be fair and impartial."

Benjamin also challenges the court's refusal to dismiss juror 700 for cause, claiming the juror presented "a deeply held belief that police officers always tell the truth" and, as a result, could not be unbiased.  The court rejected this argument, noting the juror, after additional questioning by the court, "indicated

a willingness to give fair consideration to competing points of view even if one of them comes from a police officer."

We discern no abuse of discretion in the court's determination, following its voir dire of the jurors, that they could decide the issues presented fairly and impartially and that their beliefs, attitudes, or prior experiences would not substantially interfere with their duties. Simon, 161 N.J. at 465. Both jurors responded to the court's questions in a manner supporting the court's determinations there was no cause to excuse them. Benjamin therefore failed to sustain his burden under the DiFrisco standard; he did not establish the court had erred by failing to remove either juror for cause. 137 N.J. at 470. For that reason alone, we reject Benjamin's claim he is entitled to reversal because the court did not excuse the jurors for cause.

Benjamin's claim also fails under the DiFrisco standard because he does point to any evidence establishing that a partial juror remained on the jury due to his claimed "forced expenditure of" his peremptory challenges. See ibid. He generally argues that if he had not exhausted his peremptory challenges, he would have also excused juror number 023 (juror 023). He claims juror 023 was partial because she had once applied for jobs with various law enforcement

agencies, including the Camden Police Department, and had been offered a job but did not take it because she "had already [obtained] a job in education."

We find nothing in the juror's responses to the court's voir dire supporting a conclusion she was partial and could not serve as a fair juror. Indeed, as a general rule, a juror's mere employment, or potential employment, as a law enforcement officer does not provide cause to excuse a prospective juror or require reversal of a conviction by a jury that includes a member of law enforcement. See State v. Reynolds, 124 N.J. 559, 565 (1991) (explaining although "prudence counsels that a court, on request of a defendant in a criminal case, should be inclined to excuse a member of the law-enforcement community . . . it does not follow that the presence of a member of the law-enforcement community on a jury constitutes grounds for reversal"). Here, juror 023 had never been employed in law enforcement and her responses to the court's voir dire provides no support for Benjamin's claim that her prior submission of applications for a law enforcement position would "substantially interfere with . . . her duties" as a fair and impartial juror. Simon, 161 N.J. at 464.

Benjamin failed to sustain his burden under the DiFrisco standard, 137 N.J. at 469, and we otherwise discern no abuse of the court's discretion in

41

rejecting Benjamin's for-cause challenges to jurors 739 and 700. The court did not err by denying his request to excuse those jurors and, even if it did, Benjamin failed to demonstrate the court's alleged error resulted in a jury with a juror who he could have properly otherwise excused for cause.

Scott's Testimony and The Court's Denial of Defendants' Mistrial Motions

Defendants made motions for a mistrial during Scott's testimony. The State had called Scott as a witness and obtained his appearance at trial through the execution of a material-witness warrant. See generally N.J.S.A. 2C:104-1 to -9. During his direct testimony, Scott claimed he did not remember what he had said during his July 2017 recorded statement to the police and he otherwise disavowed what he had told the police during the statement. The court conducted a Gross hearing outside the jury's presence and determined the statement was admissible.[7] The court had excused Scott from the courtroom during the hearing.

_____

[7] A hearing pursuant to State v. Gross, 121 N.J. 1 (1990), is a "hearing that the trial court conducts to determine the admissibility of a witness's inconsistent out-of-court statement—offered by the party calling that witness—by assessing whether the statement is reliable." State v. Greene, 242 N.J. 530, 540 n.2 (2020). Neither Dralle nor Benjamin claims the court erred by determining Scott's initial statement to the police was admissible under the Gross standard.

It was late in the day when the hearing concluded, and the court excused the jury after the Gross hearing and directed that they return the following day. After the jury left the courtroom, the court advised counsel and defendants that it had been informed by sheriff's officers that Scott, who was in custody on the material witness warrant, had "expressed . . . that he now has some interest in seeking an attorney."

The court addressed Scott outside the jury's presence and asked if he would appear for trial the next morning if he was released. Scott assured the court he would appear and said he had the ability to pay for an attorney and would "figure out" whether to get an attorney by "mak[ing] some calls" once he was released. The court ordered Scott's release with a subpoena requiring his appearance the following day.

The next day, Scott appeared for trial and informed the court he obtained an attorney who had requested that the court call him. Noting that Scott's attorney had not communicated with the court, the judge explained to Scott that an attorney "can't just ask . . . for [the court], in the middle of trial, to call him." The court directed that the trial resume with the continuation of the State's direct examination of Scott.

A-2056-20

Defendants' respective counsel objected to the court's decision to proceed in that manner arguing, at least in part, that Scott should have an opportunity to consult with counsel about any Fifth Amendment issues prior to continuing his testimony. The State argued that Scott had testified the previous day without any assertion of a Fifth Amendment privilege, Scott's direct testimony was effectively complete because the State did not intend to ask him any additional questions, and it was therefore too late for Scott to raise any Fifth Amendment claims.

The court stated the trial would continue with Scott taking the stand as a witness, and Scott replied, "[e]ven if it's incriminating myself?" The court advised Scott, "what we have to do is move forward. If you have a good faith basis to take that position, I suppose you'll say so, and then we'll have to deal with" any issues pertaining to self-incrimination "when we get to it." Thus, the court left open the issue of Scott's possible assertion of a Fifth Amendment privilege pending the continuation of his testimony and any putative assertion of the privilege as he testified before the jury.

The trial continued before the jury. The State did not ask Scott any further questions on direct and instead moved the recording of Scott's statement to the

police into evidence and played the recording for the jury. When the recording ended, the State advised the court it had no further direct examination for Scott.

Immediately following completion of Scott's direct testimony, and while still in the presence of the jury, the court sua sponte made the following statements:

> All right. Let me just note for the record that to the extent that this witness, Mr. Scott, has exerted a Fifth Amendment privilege, what I've ruled is that—is this: I base it on my review of the relevant rules of evidence pertaining to the subject. I'm looking specifically at the 2019 edition of the New Jersey Rules of Evidence Edited by Biunno, Weissbard, and Zegas.
>
> [N.J.R.E.] 503 talks about self-incrimination itself.
>
> [N.J.R.E.] 502—Rule 502 of evidence talks about the definition of an incrimination.
>
> There are comments after that, and in Comment Number 1, after that, the editors note this about this exercise of this privilege. They say, "In determining whether the matter will directly, under N.J.R.E. 502(a), inferentially N.J.R.E. 502(b), or indirectly N.J.R.E. 502(c) incriminate, there must be reasonable cause on the part of the witness to apprehend criminal prosecution," citing—I'm omitting citations . . . .

Benjamin's counsel interrupted the court, objected and, at sidebar and after the court excused the jury, moved for a mistrial, arguing it was "inappropriate" for the court to refer to Scott's "right to silence" in front of the jury. Dralle's

A-2056-20

counsel joined the mistrial motion, and the State opposed it, arguing defendants had failed to demonstrate the court's comments prejudiced defendants or deprived them of a fair trial.

The court denied the motion, finding its statements had not "expose[d] either defendant to any prejudice." The court also advised counsel it would provide the jury with a curative instruction at their request, but Dralle's and Benjamin's respective counsel never requested a curative instruction.

The trial continued. In response to questions asked during Benjamin's counsel's cross-examination, and without objection, Scott volunteered an explanation for his concern about incriminating himself. When asked why he had told the police in his recorded statement that Benjamin had made certain statements about his involvement in Deanna's murder, Scott testified he was "just try[ing] to help [himself] out." He further volunteered that he could have testified at trial that what he had told the police during the recorded statement "was probably a lie," and the reason he "wanted an attorney to help him not incriminate himself" was because he wanted to testify at trial that what he had said in the recorded statement was a lie. Stated differently, Scott explained that he was concerned about incriminating himself if he testified at trial that he had lied in his recorded statement to the police.

Benjamin, in point III of his brief, and Dralle, in point IV of his brief, assert the court erred by denying their motions for a mistrial. Benjamin claims the court erred by informing the jury that Scott "has exerted [sic] a Fifth Amendment privilege." Dralle suggests in part the court had "instruct[ed] the jury as to Scott's right to remain silent and his refusal to testify" and claims a mistrial was mandated because the court's reference to Scott and the Fifth Amendment "left the jury to speculate on how Scott would have testified if there had not been this issue." Defendants also claim the court's purported errors were never cured by a jury instruction. Defendants accordingly assert the court's comments concerning Scott deprived them of their right to a fair trial and the court therefore erred by denying their mistrial motions.

We review the court's decision to deny a motion for a mistrial for an abuse of discretion. See State v. Herbert, 457 N.J. Super. 490, 503 (App. Div. 2019). "A mistrial should only be granted 'to prevent an obvious failure of justice.'" State v. Smith, 227 N.J. 36, 47 (2016) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)); see also State v. Yough, 208 N.J. 385, 397 (2011) ("The grant of a mistrial is an extraordinary remedy"); State v. Witte, 13 N.J. 598, 611 (1953) (a mistrial should only be granted with the "greatest caution"). And, if "an

appropriate alternative course of action" exists, a mistrial is not a proper exercise of discretion. State v. Allah, 170 N.J. 269, 281 (2002).

"The [F]ifth [A]mendment to the United States Constitution provides in part that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" State v. Hartley, 103 N.J. 252, 260 (1986) (citing U.S. Const. amend. V). The Fifth Amendment privilege is "firmly established as part of the common law of New Jersey and has been incorporated into our Rules of Evidence." Ibid. (citation omitted); see also N.J.R.E. 503. The privilege, which must be invoked by the person claiming its protection, see State Farm Indem. Co. v. Warrington, 350 N.J. Super. 379, 383 (App. Div. 2002), encompasses the right to "refuse to testify at a criminal trial, and 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings,'" id. at 382 (quoting Minnesota v. Murphy, 465 U.S. 420, 426 (1984)).

"It is reversible error for the prosecution to call a witness when [it] knows in advance that the witness is likely to invoke the Fifth Amendment because it would 'place before the jury innuendo evidence or inferences of evidence which the State could not get before the jury by the direct testimony of the witness.'"

State v. Jordon, 197 N.J. Super. 489, 502-03 (App. Div. 1984). But see Burns, 192 N.J. at 334 (finding it was not error for the prosecutor to call a witness who only expressed hesitancy to testify); State v. Williams, 59 N.J. 493, 499 (1971) (holding a trial court is not required "to accept the witness's mere statement that the answer will tend to incriminate him"). That is because a State's witness's invocation of the Fifth Amendment in the presence of the jury "'operates to prejudice the defendant in the jury's eyes[,]'" as its "'practical result'"—despite producing no direct evidence—is creating adverse "'inferences that may be drawn which create a substantial danger of undue prejudice . . . and mislead the jury[.]'" State v. Nunez, 209 N.J. Super. 127, 133 (1986) (quoting State v. Jordon, 197 N.J. Super. 489, 503 (App. Div. 1984)); see also N.J.R.E. 532 (providing in part neither the court nor counsel may comment upon the exercise of any privilege not to testify and no presumption shall arise from the exercise of such a privilege).

Here, we are not presented with a circumstance where a witness exercised his right against self-incrimination in front of the jury or otherwise. Scott had effectively completed his direct examination in front of the jury without any assertion of that right during the first day of his testimony, before he told the sheriff's officers he might obtain an attorney. When Scott appeared for the

second day of his testimony—and first mentioned his concern about incriminating himself—he had already completed his direct testimony. On the second day he appeared at trial the State simply played the recording of his statement to the police and then ended its direct examination of him without asking him any further questions on direct. At no time during his direct testimony or during his subsequent cross examination and re-direct examination did he assert his right against self-incrimination.

A fair reading of the record compels the conclusion that the court's brief statements concerning Scott and the Fifth Amendment were not directed to the jury and did not constitute directions to the jury. Defendants' claims to the contrary ignore the record. The court's comments were clearly directed to counsel and were intended to close the loop in response to defendants' objection to proceeding with Scott's testimony on the second day when Scott had appeared without counsel. As noted, after argument concerning whether the trial should continue after Scott, outside of the jury's presence expressed concern about incriminating himself, the court stated that if Scott had a good faith basis to take that position and so stated during his testimony, the court would deal with the issue at that time. More particularly, the court advised counsel it would address

50

any assertion of the Fifth Amendment privilege by Scott "when we get to it." The court never had to "get to it" because Scott never asserted the privilege.

In our view, the court's sua sponte comments concerning Scott and the Fifth Amendment constituted an attempt to make clear that Scott had not, in fact, exercised his Fifth Amendment right not to incriminate himself during his direct examination so that there was no longer an issue the parties and the court needed to "deal with." The court's comments are riddled with legal jargon with short-hand references to the Rules of Evidence and a legal text. We discern no basis to conclude the jury was the intended audience for the comments or that the comments were delivered in a manner that would have permitted the jury to conclude the court had intended to instruct it.

The court also never stated in front of the jury or otherwise that Scott had exercised his right not to incriminate himself. The court's sua sponte statement were clearly and expressly limited. The judge stated only that "to the extent" Scott "has exerted a Fifth Amendment privilege, what I've ruled is that . . . ." Thus, the court's comments could not have affected the jury because Scott had not to any "extent" exerted his Fifth Amendment privilege against self-incrimination.

That is not to say the court did not err by making its comments before the jury. The court should not have made what it intended to be a legal ruling on the issue of Scott's potential, but never realized, assertion of his Fifth Amendment privilege during his testimony before the jury. See N.J.R.E. 532. And the court's effort to make its ruling was unnecessary because Scott had not invoked the privilege.[8]

We are unconvinced, however, that the court's error prejudiced defendants or required a mistrial. As noted, the court's brief but errant reference to Scott and the Fifth Amendment privileged was directed to counsel and did not constitute an instruction to the jury. The court expressly stated that its comments applied only to the extent Scott had invoked the privilege and he had not done so. Thus, even if it had considered the court's comments, the jury was compelled to conclude they had no application to its analysis of the evidence or determination of defendants' guilt on the charges because Scott had never invoked his Fifth Amendment privilege and the court's comments applied only "to the extent" the privilege had been invoked.

---

[8] We note the court was interrupted by defendants' objection to his comments before it actually made any ruling, and the court did not complete its ruling after the objection and its denial of defendants' mistrial motions.

As the Court explained in Burns in the context of a witness who had invoked the privilege before the jury, a "witness's refusal to answer a question" by invoking the Fifth Amendment privilege "add[s] critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudice[s] the defendant." 192 N.J. at 333-34 (emphasis added) (quoting Namet v. United States, 373 U.S. 179, 187 (1963)). There is no danger defendants suffered any prejudice from the court's comments since Scott never invoked the privilege and never refused to answer any questions posed during the trial. Aware that the court had made its comments and denied their mistrial motions, defendants were free to question Scott about any issues related to his testimony without any concern they would be prejudiced by his refusal to respond to their queries. Moreover, during cross-examination by Benjamin's counsel, Scott testified that he had a concern about self-incrimination but that it pertained solely to the potential he might incriminate himself by testifying at trial that his recorded statement to the police had been a lie. Defendants therefore had the opportunity to fully vet Scott's self-incrimination concern at all times during his testimony at trial.

In our assessment of a court's error, we must consider "whether in all the circumstances there [is] a reasonable doubt as to whether the error denied a fair

trial and a fair decision on the merits." State v. G.E.P., 243 N.J. 362, 389 (2020) (alteration in original) (quoting State v. Mohammed, 226 N.J. 71, 86-87, (2016)). For the reasons we have explained, we find no such reasonable doubt warranting a reversal of defendants' convictions. We do not find the court's limited comments concerning an absent invocation of Scott's Fifth Amendment privilege may have "tipped the scales" in the State's favor, such that it substantially contributed to the jury's verdict. State v. Jackson, 243 N.J. 52, 73 (2020) (alteration in original) (quoting State v. Prall, 231 N.J. 567, 581 (2018) (finding an error harmless where the error "raise[s] a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached.")). For the same reasons, the court did not err by denying defendants' mistrial motion.

Defendants also argue the court should have provided a curative instruction following their objections to the court's comments. The court asked defendants if they wanted it to provide a curative instruction to the jury, and defendants did not request that the court do so. Therefore, any error in the court's purported failure to provide a curative instruction was invited and does not provide grounds for reversal of defendants' convictions. See State v. A.R., 213 N.J. 542, 561 (2013) (explaining under the "invited-error doctrine . . . trial errors that 'were induced, encouraged or acquiesced in or consented to by

defense counsel ordinarily are not a basis for reversal on appeal'" (quoting State v. Corsaro, 107 N.J. 339, 345 (1987))).  However, even if the court should have sua sponte provided a curative instruction, based on the circumstances presented and for the reasons we have explained, the putative error was not clearly capable of producing an unjust result, R. 2:10-2, such that defendants are entitled to reversal of their convictions.

Dralle Challenges Alleged Lay-Opinion Testimony

During the investigation, police conducted searches of defendants' cell phones.  At trial, Sergeant Chris Robinson, Commander of the Camden County Prosecutor's Office's High Tech Crimes Unit, testified about the use of Cellebrite software that had been used to extract data from the phones.  A detective who was unavailable at trial had extracted the data from Dralle's phone and generated an extraction report that Sergeant Robinson had reviewed and about which he testified.

Dralle challenges for the first time the admission of testimony from Sergeant Robinson and Detective Houck about the extraction of information from both defendants' cell phones using Cellebrite and Axiom software.  According to Dralle, Sergeant Robinson's and Detective Houck's testimony was improperly admitted as a lay opinion because expert testimony was required

regarding the software.[9]  Dralle also challenges the resulting admission of the "text messages and internet searches" on defendants' phones, discovered as a result of the use of the Cellebrite and Axiom software.  Because Dralle lodged no objection to the testimony, we review its admission on appeal for plain error. Singh, 245 N.J. at 13; R. 2:10-2.  We find none.

Generally, "[a] fact witness is one who testifies as to what 'he or she perceived through one or more of the senses[,]'" State v. Miller, 449 N.J. Super. 460, 470 (App. Div. 2017), rev'd on other grounds, 237 N.J. 15 (2019) (quoting State v. McLean, 205 N.J. 438, 460 (2011)), and whose testimony consists of "a description of what the" person "did and saw" based on first-hand knowledge, ibid.  This differs from an expert witness, who testifies based upon "'scientific, technical, or other specialized knowledge . . . that is beyond the understanding of the average person,'" ibid. (quoting State v. Simms, 224 N.J. 393, 403 (2016)), and a lay-opinion witness, who testifies "in the form of opinions or inferences if it (a) is rationally based on the perception of the witness and (b) will assist in

---

[9]  Dralle also argues the court erred by not holding a Frye hearing to establish the reliability of the software.  293 F. at 1013.  We decline to address the merits of the claim because a request for the hearing was not made before the trial court.  See State v. Witt, 223 N.J. 409, 419 (2015) ("For sound jurisprudential reasons, with few exceptions," we "'decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available'" (quoting Robinson, 200 N.J. at 20)).

understanding the witness' testimony or in determining a fact in issue," id. at 471 (quoting McLean, 205 N.J. at 456).

Police officers may "testify in a variety of roles." Id. at 470. Law enforcement officers may testify as a fact witness if their testimony "'does not convey information about what the officer "believed," "thought" or "suspected[.]"'" Ibid. (quoting McLean, 205 N.J. at 460). Officers may also testify as lay witnesses where their testimony is "'based on their personal observations and their long experience in areas where expert testimony might otherwise be deemed necessary.'" Id. at 471 (quoting State v. LaBrutto, 114 N.J. 187, 198 (1989)).

For example, in Miller, we concluded that an officer who testified about his investigation of a defendant's laptop, and "merely reported what he found" through his utilization of "peer-to-peer software," testified only in the capacity of a fact witness because he did not provide an opinion on his findings. Ibid. We also found that even if the officer's testimony "fell within the scope" of expert opinion testimony, its admission was harmless because the officer also testified that "he possessed sufficient education, training and experience to qualify as an expert in the field of computer forensics." Ibid.

So too here. Our review of the record establishes that Sergeant Robinson testified in the capacity of a lay witness regarding his experience using the Cellebrite software. McLean, 205 N.J. at 456. Sergeant Robinson testified that he has worked for about five years in the Camden County's Prosecutor's Office as the Unit Commander for the High Tech Crimes Unit, which is a department that "process[es] all the electronic digital evidence that comes in through the County." He detailed the extensive training he had received, including training tailored to the use of Cellebrite—"a company that manufactures software and hardware to conduct extractions on cellular devices"—and how the High Tech Crimes Unit regularly utilizes Cellebrite's software to perform cell phone data extractions. Sergeant Robinson also explained—based on his firsthand knowledge and use of the software—what information the software extracts and how it generated the "extraction reports" during the investigation that were admitted in evidence at trial.

Sergeant Robinson's testimony was based on his personal knowledge and experience using Cellebrite software in his role as Unit Commander. LaBrutto, 114 N.J. at 198. And, to the extent Sergeant Robinson testified as an expert witness based upon his specialized knowledge of Cellebrite, we find any error in the admission of his testimony harmless, R. 2:10-2, because he adequately

established his familiarity and understanding of cell-phone extractions through the use of Cellebrite software based on his experience and training as Unit Commander, see Miller, 449 N.J. Super. at 471.

Similarly, Detective Houck testified he has worked for the High Tech Crimes Unit for seven-and-a-half years as a forensic examiner, utilizing Cellebrite software and Axiom software to extract data from cell phones. Then, in a succinct manner, he explained the difference between Cellebrite and Axiom and how each software is utilized by officers within the Unit. He also explained that he had reviewed the extraction reports of defendants' cell phones when they were completed to confirm that the software had extracted the information correctly and he had provided the extraction reports to Detective Barber, the lead investigating detective. Again, based upon Detective Houck's personal knowledge of the software, and his experience and training related to it, we find no harmful error in the admission of his limited testimony at trial. R. 2:10-2.

In sum, we reject Dralle's claim the detectives' testimony about the extraction of information from his cell phone constituted inadmissible expert testimony requiring reversal of his conviction.

<u>Alleged Prosecutorial Misconduct</u>

Dralle asserts that the prosecutor engaged in misconduct by making improper comments during summation. Prior to addressing the comments about which Dralle complains, we summarize the principles that guide our analysis.

We review the challenged comments for plain error because defendant did not object to them at trial. <u>See</u> <u>State v. Tilghman</u>, 345 N.J. Super. 571, 575 (App. Div. 2001). "Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." <u>State v. Frost</u>, 158 N.J. 76, 82 (1999). However, a prosecutor "must refrain from improper methods that result in a wrongful conviction." <u>State v. Smith</u>, 167 N.J. 158, 177 (2001).

Comments by a prosecutor will be grounds for reversal of a criminal conviction only if the conduct was so egregious as to deprive defendant of a fair trial. <u>State v. Smith</u>, 167 N.J. 158, 181 (2001). To deprive a defendant of a fair trial, the prosecutor's conduct "must have been 'clearly and unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." <u>Id.</u> at 182 (quoting <u>State v. Timmendequas</u>, 161 N.J. 515, 575 (1999)).

We evaluate challenged remarks not in isolation but in the context of a summation as a whole, State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008), and the entire record, State v. Bey, 129 N.J. 557, 620 (1992). That is because "[n]ot every instance of misconduct in a prosecutor's summation will require a reversal of a conviction. There must be a palpable impact." State v. Swint, 328 N.J. Super. 236, 261 (App. Div. 2000). Where, as here, there is no objection to a prosecutor's remarks or comments at trial, "it is a sign 'that defense counsel did not believe the remarks were prejudicial' when they were made." State v. Pressley, 232 N.J. 587, 594 (2018) (quoting State v. Echols, 199 N.J. 344, 360 (2009)).

"A prosecutor is permitted to respond to an argument raised by the defense so long as it does not constitute a foray beyond the evidence adduced at trial." State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001). When reviewing a prosecutor's summation, we "must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." Ibid. (quoting United States v. Young, 470 U.S. 1, 12 (1985)).

Viewing each of the prosecutor's statements in isolation or cumulatively, we find no impropriety and thus no comments that denied Dralle a fair trial. Indeed, all but one of the challenged comments were made in direct response to

arguments raised by defense counsel in summation. Munoz, 340 N.J. Super. at 216; see also State v. Smith, 212 N.J. 365, 403-04 (2012).

More particularly, Dralle first challenges the prosecutor's statement that the jury should "be very wary when someone tells you that a person is telling half the true [sic], half a lie, and they're the ones who can tell you what the half is true and what the half is a lie." As Dralle recognizes, however, the prosecutor made the statement in response to defendants' counsels' arguments to the jury that certain parts of Barner's testimony—those parts that were helpful to Dralle—were truthful while other parts—those portions that were harmful to Dralle—should be deemed not credible.

Dralle claims the prosecutor's comments were improper because they "cast unjustified aspersions on" and "impugn[ed] the integrity" of defense counsel. We disagree. The comments were made in response to defense counsels' perhaps incongruous arguments about Barner's credibility and suggested to the jury only that it should be "wary" of defense counsel's claims that Barner was trustworthy only when he offered testimony helpful to defendants. We find nothing improper about the comment, which was properly made in direct response to defense counsel's arguments about Barner's credibility. Munoz, 340 N.J. Super. at 216.

Dralle also claims the prosecutor engaged in misconduct by asserting that both defense counsel had stated "with what sounded like certainty" that "Barner drove" to the Scordo residence on the night of the murder and that "he drove four people." Dralle asserts that by attributing "certainty" to defense counsels' statements, the prosecutor's comments improperly suggested that defendants had "revealed incriminating facts to their lawyers."

Dralle reads too much into too little. The prosecutor's comment was made in further support of the State's contention that defendants wanted the jury to accept Barner's credibility as to facts that supported them but reject his testimony on the facts that established their guilt. And, contrary to Dralle's contention, there is nothing in the comment suggesting that the prosecutor was arguing defense counsel had obtained incriminating information from their clients. Fairly read in context, the prosecutor merely pointed out that although defense counsel had relied with confidence on certain portions of Barner's testimony—including that he had driven four people to the Scordo home—they incongruously wanted the jury to find not credible that Dralle and Benjamin were among the four occupants of the car. Again, there was nothing improper about the prosecutor's comment; it was made in response to defense counsels' attack on Barner's credibility and constituted appropriate argument.

63

We also find no merit in Dralle's claim that the prosecutor engaged in misconduct by stating, "I think [defense counsel's] argument . . . is that [Barner] did something wrong so he consults an attorney and they come up with this crazy scheme where he's going to admit to being a driver but then put in a part where someone threatened him." Dralle further argues the prosecutor inappropriately commented on Barner's invocation of his right to counsel by stating, "[i]f [Barner] had this elaborate plan to get out of trouble and contact an attorney, I'm not a defense attorney, but it's a whole lot easier to just stay home."

Dralle ignores the record. The prosecutor made the comments in response to defense counsel's claims during summation. More specifically, defense counsel in summation—in what appears to have been an effort to diminish Barner's credibility—referenced the fact that Barner, after his first statement to police, had "looked at the internet" to search for immunity, defenses, and a lawyer, and he "had a lawyer and was granted immunity" when he testified.

In Dralle's challenge to the prosecutor's comments about Barner and his search for counsel, he ignores that Barner's search for a lawyer was first raised by defense counsel and, in the prosecutor's summation, he attempted only to refute defense counsel's claims concerning Barner. Accordingly, we do not find the challenged statements improper and, instead, we are convinced they

64

constituted fair comment on Barner's internet search for a lawyer about which defense counsel raised in the first instance.

Dralle last claims that the prosecutor "distorted the truth" "clarif[ying]" in summation that Barner "was not a friend of [defendants]" or in their "social circle." We reject the contention because whether Dralle and Barner were friends or in the same social circle was not an issue of import in the case and the prosecutor's argument is otherwise arguably supported by the evidence, and reasonable inferences based on the evidence, at trial. Munoz, 340 N.J. at 216. We therefore find no error in the prosecutor's comments about Barner's and Dralle's putative friendship or social circle.

We also reject Dralle's challenge to the various comments because he makes no showing that even if improper, they deprived him of a fair trial, or otherwise "substantially prejudiced" his "fundamental right to have a jury fairly evaluate the merits of his defense" such that his conviction must be reversed. Smith, 167 N.J. at 181-82. And, because we have explained that the statements Dralle challenges were either made in response to defense counsels' claims or were supported by evidence or "reasonable inferences from that evidence," State v. Bradshaw, 195 N.J. 493, 510 (2008), we find no prosecutorial misconduct or any other grounds for reversal based on the claim.

<u>Jury Charges</u>

Dralle asserts that the court's jury instruction on accomplice liability and immunity of a witness deprived him of a fair trial. Dralle argues the accomplice liability charge likely created confusion for the jury in its consideration of the felony-murder count because Dralle was charged with accomplice liability only on the robbery and knowing-and-purposeful murder charges, and the felony-murder charge was based only on the underlying crime of second-degree burglary. Dralle further argues the court's instruction on witness immunity, which was based on the model charge, improperly "creates the inference of credibility on the part of the immunized witness." Dralle did not object to any of the challenged jury charges at trial.

"When a defendant does not request an instruction or fails to object . . . we review for plain error." <u>State v. Dunbrack</u>, 245 N.J. 531, 544 (2021); <u>see also</u> <u>R.</u> 1:7-2 ("no party may urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the jury retires to consider its verdict . . . ."). Plain error in the context of a jury charge "requires demonstration of legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the

error possessed a clear capacity to bring about an unjust result." State v. Singleton, 211 N.J. 157, 182-83 (2012) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

Proper jury "instructions are essential to a fair trial," and we consider any alleged error in the totality of the entire charge. State v. Clausell, 121 N.J. 298, 330 (1990); see also State v. Nero, 195 N.J. 397, 407 (2008) ("The alleged error is viewed in the totality of the entire charge, not in isolation."). And, while "[n]o party is entitled to have the jury charged in his or her own words[,]" State v. Whitaker, 402 N.J. Super. 495, 513 (App. Div. 2008) (quoting State v. Pleasant, 313 N.J. Super. 325, 333 (App. Div. 1998)), the jury charge must contain "all 'essential and fundamental issues and those dealing with substantially material points,'" ibid. (quoting State v. Green, 86 N.J. 281, 290 (1981)).

"Model jury charges are often helpful to trial judges in performing the important function of charging a jury" and "a jury charge is presumed to be proper when it tracks the model jury charge because the process to adopt model jury charges is 'comprehensive and thorough.'" State v. Cotto, 471 N.J. Super. 489, 543 (App. Div.) (quoting State v. R.B., 183 N.J. 308, 325 (2005)), , certif. denied, 252 N.J. 166 (2022). Put differently, "[w]hen a jury instruction follows the model jury charge, although not determinative, 'it is a persuasive argument

in favor of the charge as delivered.'" Whitaker, 402 N.J. Super. at 514 (quoting State v. Angoy, 329 N.J. Super. 79, 84 (App. Div. 2000)).

Applying these principles to the portions of the jury charge challenged by Dralle, we discern no error. First, Dralle argues the court's charge on accomplice liability was confusing. He concedes that the court accurately instructed the jury that it could find him guilty of felony murder only if it first found him guilty of burglary as a predicate offense and that a felony-murder conviction could not be based on his commission of conspiracy to commit burglary.

Dralle, however, claims the court erred in its subsequent instruction on accomplice liability. On accomplice liability, the court instructed as follows:

> [T]he State alleges that . . . defendant is equally guilty of the crimes committed by another person because he acted as an accomplice with the person that the specific crimes . . . charged be committed. In order to find . . . defendant guilty of the specific crimes charged, the State must prove beyond a reasonable doubt each of the following elements. One, that another person committed the crimes of armed robbery and murder. I have already explained the elements of those offenses. Two, that . . . defendant solicited him to commit them or did aid or agree or attempt to aid him in planning or committing them.
>
> [(Emphasis added).]

Dralle argues that, because the jury had been previously instructed on the elements of conspiracy, the accomplice-liability charge was confusing because

68

the court did not adequately identify the counts to which the accomplice-liability charge applied. Dralle cites to instances in the jury charge in which the court broadly referred to "the specific crimes charged" instead of "armed robbery and murder." Dralle further asserts that the court's instruction—that an accomplice is "equally guilty of the crimes committed by another person"—was contrary to the court's earlier instruction on the felony-murder count.

Contrary to Dralle's claim, the portion of the accomplice liability charge we have cited expressly states it applies to the charges of murder and armed robbery. And, more importantly, the instruction defines as an element of a finding of accomplice liability that the State must prove that "another person committed the crimes of robbery and murder." The accomplice liability charge does not refer to any of the other crimes charged against defendant about which the jury was required or permitted to find "another person" had committed.

Moreover, in making his argument, Dralle ignores the remainder of the jury instruction, in which the court again makes clear that accomplice liability applied solely to the crimes of robbery and murder. The court instructed:

> In order to convict a defendant as an accomplice to the specific crimes charged, you must find that . . . defendant had the purpose to participate in that particular crime. He must act with the purpose of promoting or facilitating the commission of the substantive crimes with which he is charged.

A-2056-20

It is not sufficient to prove only that . . . defendant had knowledge that another person was going to commit the crimes charged. <u>The State must prove that it was . . . defendant's conscious object that the specific conduct charged be committed. In sum, in order to find . . . defendant guilty of committing the crimes of armed robbery and murder, the State must prove each of the following elements beyond a reasonable doubt: that another person committed the crimes of armed robbery and murder</u>, that's one; two, that . . . defendant solicited him to commit them or did aid or agree or attempt to aid him or her in planning or committing them; three, that . . . defendant's purpose was to promote or facilitate the commission of the offenses; four, that . . . defendant possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act.

[(Emphasis added).]

The court's complete instruction on accomplice liability did not present any opportunity for confusion about the offenses—robbery and murder—to which accomplice liability applied. The court used the language of the model jury charge, <u>see</u> <u>Model Jury Charges (Criminal)</u>, "Liability for Another's Conduct (N.J.S.A. 2C:2-6)" (rev. June 11, 2018),[10] which we presume to be proper, <u>Cotto</u>, 471 N.J. Super. at 543.

---

[10] The accomplice liability model jury charge has since been updated, <u>see</u> <u>Model Jury Charges (Criminal)</u>, "Liability for Another's Conduct (N.J.S.A. 2C:2-6(c)(1)(c)) Accomplice–Legal Duty" (approved June 7, 2021), but none of the changes are relevant to Dralle's arguments on appeal.

We also note "the general presumption that jurors act in good faith and seek to comply with the court's instructions." State v. Bey, 112 N.J. 45, 83 (1988), and application of the presumption here requires the conclusion that the jury could not have been confused about the only crimes to which accomplice liability applied. The court's charge permitted a finding of accomplice liability only on the robbery and murder charges.

Dralle also challenges the court's instruction on Barner's immunity. Dralle acknowledges that the court instructed the jury in accordance with the model charge, see Model Jury Charges (Criminal), "Witness Immunity" (approved Feb. 25, 1991), but asks that we find that charge is so legally erroneous that its use constituted plain error. He claims that the model charge "creates the inference of credibility on the part of the immunized witness by explicitly stating that the State may prosecute the witness for false or perjured testimony." Dralle further objects to the court informing the jury that Barner was ordered to testify as that "create[d] an aura of reliability" for his testimony.

We find no language in the charge suggesting immunized witnesses should be deemed or considered credible. The charge states that "[t]he fact that a witness has been granted immunity with respect to any testimony which incriminates them is a factor . . . which [the jury] should consider in evaluating

[the witness's] testimony and in determining the weight" given to the testimony. Nothing in that language imputes credibility to a witness who testifies under a grant of immunity. To the contrary, as part of the instruction, the court explained that a witness who testifies under a grant of immunity "should be given careful scrutiny" and "[i]n weighing the testimony," the jury "may consider whether in order to obtain . . . the immunity for himself, he's telling a lie to you or whether, having been granted immunity, he is telling the truth." That language undermines any claim the model instruction erroneously imputes credibility to a witness testifying under a grant of immunity.

For those reasons, we do not the find court's instruction in accordance with the model jury charge constituted error or otherwise could have led to an unjust result so as to constitute plain error, R. 2:10-2; Singleton, 211 N.J. at 182-83.

Jury Questions

Benjamin and Dralle contend for the first time on appeal that the court erred in its response to the jury's request for a playback of the testimony of Barner and cross-examination of Scott and that this error deprived them of a fair trial. More particularly, they claim that when the jury requested to hear the testimony of Barner, the court improperly commented that it would take four hours for the readback of the testimony and that caused the jury to withdraw its

request. Benjamin argues the court exerted undue influence on the jury in response to its request for a playback of Scott's cross-examination because the court informed the jury it must also hear a read-back of his direct examination as well. We review the claims for plain error. R. 2:10-2; State v. Weston, 222 N.J. 277, 294 (2015).

"It is well-established that 'the reading of all or part of the testimony of one or more of the witnesses at a trial, criminal or civil, at the specific request of the jury during their deliberations is discretionary with the trial court.'" State v. Wilson, 165 N.J. 657, 660 (2000) (quoting State v. Wolf, 44 N.J. 176, 185 (1965)). "Absent 'some unusual circumstance,' those requests should be granted." State v. Miller, 205 N.J. 109, 119-20 (2011) (quoting Wolf, 44 N.J. at 185).

In Miller, the Court established "certain guidelines for the playback of video testimony," finding in part that a court shall not decline such a request merely because it "'would take time.'" Ibid. (quoting Wolf, 44 N.J. at 186). The general rule is that if a jury requests a readback of the testimony of a witness, the readback should include both direct and cross-examination "so that evidence may be considered in its proper context." Ibid. Although trial courts "should honor a jury's specific request to hear only limited parts of a witness's

testimony[,]" that playback should still "include[] relevant direct and cross-examination." Id. at 123. However, "[j]urors should not be required to watch or hear more testimony than they ask for" and "[i]f necessary, the trial judge can clarify what testimony the jury wants repeated." Ibid.

We discern no error, let alone plain error, in the court's responses to the jury playback requests. The court gave the jury accurate information as to the time it would take to comply with its request to hear Barner's testimony for scheduling purposes. And, the time it would take to comply with the jury's request was particularly relevant because the court had earlier informed the parties and the jurors that trial would stop at 3:00 p.m. that day in light of an impending holiday weekend. The court did not decline the jury's request based on the amount of time it would take, Miller, 205 N.J. at 119-20, or implement a time restriction for the jury's deliberations based on its request, see State v. Nelson, 304 N.J. Super. 561, 564-65 (App. Div. 1997). The court's mention of the time—four hours—it anticipated it would take to play back Barner's testimony constituted nothing more than a courtesy extended by the court to the jury to keep the jury informed as to the manner in which the playback would proceed.

We also find no merit in Benjamin's contention that after the court explained the playback of Barner's testimony would take four hours and the jury stated it no longer wished to hear the playback of the testimony, the court was required to inquire whether the jury wished to narrow its request for "some particular portion of Barner's testimony." "When a jury requests clarification, a trial judge 'is obligated to clear the confusion.'" State v. Berry, 254 N.J. 129, 145-46 (2023) (quoting State v. Savage, 172 N.J. 374, 394 (2002)). Here, the jury did not request clarification from the court regarding the playback, ibid., and instead rescinded its playback request. Benjamin cites no support for his argument that the court was obligated to intervene in the jury's remaining deliberative process after the court sufficiently answered the jury's question regarding the playback of the testimony, and the jury did not seek further clarification on the matter.

Additionally, although Dralle asserts that the jury requested only a playback of a certain part of Scott's testimony—his cross-examination—and the court should have honored that request, trial courts must "include[] relevant direct and cross-examination" "so that evidence may be considered in its proper context." Miller, 205 N.J. at 122. The court deemed it necessary that both Scott's direct and cross-examination be played to fairly comply with the jury's

request, explaining it "really had to play all of [Scott's testimony], not just part of it" so the jury could get a "fair and complete reminder of what" Scott had said. The court did not abuse its discretion by seeking to ensure the jury considered the requested playback of the cross-examination in the complete context provided by a playback of the direct and cross-examination.

Dralle also argues for the first time that the trial court erred by failing to inquire about a jury substitution question posed by the jury. During deliberations, the jury sent a note to the court asking if "a juror who is deliberating" can "voluntarily swap with an alternate." While the court addressed the note with counsel, a court officer advised the court he had "asked what juror it was" and the jury responded that it was a "blanket question" and none of the jurors had "any type of issue or needs to come off the jury." The court appropriately brought the jury into the courtroom and asked, "am I correct in my understanding that there is not a particular . . . juror who is asking to switch, but it's just a general question about that?" The jury foreperson replied, "Right," and the court advised the jury that deliberating jurors could not switch with an alternate," and that alternates are used only when necessary.

Dralle argues the court abused its discretion by not questioning the jury further. According to Dralle, the court should have conducted an "individual

voir dire of each juror" because "[a] juror being pressured or bullied might be too shy or fearful to come forward in front of others." We review for the claim for plain error, R. 2:10-2, and in doing so, find no support for Dralle's contention.

We "traditionally have accorded trial courts deference in exercising control over matters pertaining to the jury." State v. R.D., 169 N.J. 551, 560 (2001). Under Rule 1:8-2(d)(1), if, "after submission of the case to the jury, a juror dies or is discharged by the court because of illness or other inability to continue, the court may direct" that the discharged juror be replaced by an alternate. "Any inquiry to determine whether a deliberating juror should be removed and replaced with an alternate must be carefully circumscribed to 'protect the confidentiality of jury communications.'" State v. Musa, 222 N.J. 554, 564-68 (2015) (quoting State v. Ross, 218 N.J. 130 (2014)). The "court must diligently avoid 'the inadvertent disclosure of confidential information by a juror'" because "'[m]aintaining the secrecy of jury deliberations for the purpose of encouraging free and vigorous discourse in the jury room' is of paramount importance." Ibid. (quoting State v. Jenkins, 182 N.J. 112, 134 (2004)). Further, "[i]f a jury's question is ambiguous, a trial judge 'must clarify the jury's inquiry

by ascertaining the meaning of its request.'"  Berry, 254 N.J. at 146 (quoting Savage, 172 N.J. at 394).

The court took the appropriate steps following its receipt of the jury's question.  After confirming that no individual juror sought to switch with an alternate juror, the court correctly informed the jury that generally, no substitutions can be made with an alternate juror.  See e.g., State v. Jenkins, 182 N.J. 112, 124 (2004) (forbidding juror substitution "when a deliberating juror's removal is in any way related to the deliberative process").  The court was not required to take additional action to determine the underlying cause of the jury's question.  The court made sufficient inquiry to determine that no juror sought to be excused, Berry, 254 N.J. at 146.  And, had it taken any further investigation of the genesis of the note, the court would risked improperly invading the confidentiality of the jury's communications and broader deliberative process, Musa, 222 N.J. at 568.

IV.

Dralle and Benjamin separately argue that their sentences should be reversed because the court failed to assess and weigh their relative youth as a mitigating factor in its sentencing calculus.  Benjamin was a seventeen-year-old

juvenile when Scordo's home was burglarized and Deanna was murdered.  Dralle was a twenty-year old adult at the time.

Benjamin argues that the court misapplied the factors set forth in United Miller v. Alabama, 567 U.S. 460 (2012), in its determination of his sentence. Dralle argues that the sentencing court "did not properly consider the ramifications of" mitigating factor fourteen, which requires that a sentencing court consider that "a defendant was under [twenty-six] years of age at the time of the commission of the offense," N.J.S.A. 2C:44-1(b)(14).

The court imposed on Dralle a forty-year sentence subject to NERA and Benjamin a thirty-eight-year sentence subject to NERA based on the court's detailed findings of statutory aggravating and mitigating factors under N.J.S.A. 2C:44-1(a) and (b), and its determination that the aggravating factors outweighed the mitigating factors for each defendant.  Defendants' respective arguments on appeal do not challenge the court's findings as to the statutory aggravating or mitigating factors other than, as noted, they claim for different reasons the court did not properly consider their relative youth in its imposition of their sentences.

We review a court's sentencing decision for an abuse of discretion, State v. Konecny, 250 N.J. 321, 334 (2022), and will reverse a sentence only if

> (1) the sentencing guidelines were violated (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (citing State v. Roth, 95 N.J. 334, 363-65 (1984)).]

"The test is not whether a reviewing court would have reached a different conclusion on what an appropriate sentence should be; it is whether, on the basis of the evidence, no reasonable sentencing court could have imposed the sentence under review." State v. M.A., 402 N.J. Super. 353, 370 (App. Div. 2008) (quoting State v. Tarver, 272 N.J. Super. 414, 435 (App. Div. 1994)).

In Miller, the United States Supreme Court held that trial courts sentencing juveniles in "homicide cases" must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." 567 U.S. at 480. In doing so, the Court identified several factors which courts should consider: (1) defendant's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "the family and home environment that surrounds [defendant]—and from which he cannot usually extricate himself—

no matter how brutal or dysfunctional"; (3) "the circumstances of the homicide offense, including the extent of [defendant's] participation in the conduct and the way familial and peer pressures may have affected him"; (4) whether defendant "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and (5) "the possibility of rehabilitation . . . ." Id. at 477-78.

In State v. Zuber, 227 N.J. 422, 447 (2017), our Supreme Court held that Miller's directive to consider how children are constitutionally "different" is one that "applies with equal strength to a sentence that is the practical equivalent of life without parole," including for defendants serving "lengthy term-of-years sentences that amount to life without parole," though lacking that "formal designation."  To that end, the Court held that trial courts "must evaluate the Miller factors when they sentence a juvenile to a lengthy period of parole ineligibility for a single offense," or "when they consider a lengthy period of parole ineligibility in a case that involves multiple offenses at different times"— that is, when the courts "decide whether to run counts consecutively and when they determine the length of the aggregate sentence."  Ibid.  Here, as noted, the

court imposed a thirty-eight-year sentence on Benjamin, of which he must serve more than thirty-two years without parole eligibility under NERA, and the State does not dispute that the court was required to apply the Miller factors in its determination of his sentence.[11]

Benjamin contends the court's application of the Miller factors supports "a sentence at the lowest end of the spectrum."  He does not dispute that the court made detailed findings concerning the Miller factors, and, in our view, the court's findings are well-supported by the record.[12]  What is missing from the court's sentencing analysis, however, is any explanation as to the role, if any, its findings of the Miller factors, individually and collectively, played in its

---

[11]  We recognize that Benjamin may also apply for resentencing after he serves twenty years of the sentence imposed.  State v. Comer, 249 N.J. 359, 401 (2022).

[12]  More particularly, the court noted that as to factor one, Benjamin was seventeen years old at the time of the offense and assigned the factor moderate weight; as to factor two, the court found Benjamin's home life "was lacking substantially in supervision and guidance" and assigned the factor moderate weight; as to factor three, the court found Benjamin was self-assured and independently making his own decisions surrounding execution of the murder and assigned the factor low weight; as to factor four, the court determined Benjamin's immaturity impaired his ability to listen to the advice of his counsel in the proceedings and assigned the factor moderate weight; and as to factor five, the court noted that Benjamin's age, as well as his documented accomplishments and attitude while incarcerated, suggest a high potential for rehabilitation, and assigned the factor moderate to high weight.  See Miller, 567 U.S. at 477-78; Zuber, 227 N.J. at 446-47.

determination of the aggregate sentence imposed. See Zuber, 227 N.J. at 450 (explaining the "assessment of the juvenile about to be sentenced" must include application of the Miller principles).

The court assigned at least some weight to each of the Miller factors such that it might be expected that their collective weight in some manner supported imposition of a lesser, as to opposed to a greater, sentence. It was therefore insufficient for the sentencing court to simply make its findings as to each Miller factor without further explaining, and making findings as to, the manner in which the factors affected the court's sentencing decision.

The absence of such findings permits the conclusion that although the court properly found the factors, it did not consider and apply them in determining Benjamin's sentence. Moreover, the absence of such findings renders impossible proper appellate review of the court's reliance on and consideration of the Miller factors in its imposition of Benjamin's lengthy sentence and concomitant period of parole ineligibility under NERA. See Comer, 249 N.J. at 404 (explaining sentencing courts must "make a thorough record of their findings to ensure fairness and facilitate review" (citing State v. Torres, 246 N.J. 246 (2021); Fuentes, 217 N.J. at 70-74; N.J.S.A. 2C43-2(e); R. 3:21-4(h))). We therefore deem it appropriate to vacate Benjamin's sentence

and remand for resentencing at which the court shall include in its analysis its findings as to the Miller factors and an explanation as to the effect of those findings on its determination of Benjamin's sentence.[13]

Dralle contends that the court did not probably consider his youth as a mitigating factor under N.J.S.A. 2C:44-1(b)(14).[14] In imposing sentence, the court must "identify whether any of N.J.S.A. 2C:44-1(a)'s . . . aggravating factors and N.J.S.A. 2C:44-1(b)'s . . . mitigating factors apply." Fuentes, 217 N.J. at 72. The court must make findings on the relevant statutory factors based on "competent, reasonably credible evidence[,]" ibid. (quoting State v. Roth, 95 N.J. 334, 363 (1984)), and then "balance the relevant aggravating factors and

---

[13] Our decision to vacate Benjamin's sentence and remand for resentencing shall not be interpreted as expressing an opinion of the aggregate sentence imposed by the court. As the Court explained in Zuber, "even when judges . . . use the Miller factors at sentencing, a small number of juveniles will receive lengthy sentences with substantial periods of parole ineligibility . . . ." 227 N.J. at 451. We vacate and remand for resentencing to permit the court to consider and make appropriate findings concerning the Miller factors and the manner in which the factors affect the court's sentencing decision. Of course, the remand court shall also make appropriate findings as to all other issues pertinent to the imposition of sentence.

[14] The Miller factors have no application to Dralle because he was not a juvenile at the time he committed the crimes for which he was convicted. State v. Ryan, 249 N.J. 581, 596 (2022) (refusing to "extend Miller's protections to defendants sentenced for crimes committed when those defendants were over the age of eighteen").

mitigating factors" by assigning each "appropriate weight in a case-specific balancing process." Id. at 72-73.

The court sentenced Dralle to a term of forty years, subject to the requirements of NERA. The court made thorough, reasoned findings as to each of the statutory aggravating and mitigating factors, finding aggravating factors: three, "the risk that defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3); six, the extent and seriousness of defendant's prior criminal record, N.J.S.A. 2C:44-1(a)(6); and nine, the need for deterring defendant and others, N.J.S.A. 2C:44-1(a)(9).[15] The court determined each of the aggravating factors was entitled to "high weight."

The court then found that mitigating factors eight, nine and fourteen applied. See N.J.S.A. 2C:44-1(b). For factor eight, whether "defendant's conduct was the result of circumstances unlikely to recur," N.J.S.A. 2C:44-1(b)(8), and factor nine, "[t]he character and attitude of" defendant and whether

---

[15] As to the relevant aggravating factors, see N.J.S.A. 2C:44-1(a)(3), (6), and (9), the court relied on Dralle's prior conviction for unlawful possession of a weapon—a metal pipe—in an incident that occurred only ten days prior to the murder. The court further noted that Dralle was seen on video "taken shortly after the murder . . . partying" with Benjamin and others with funds probably from "the monetary proceeds of the theft." The court also noted the "strong need to deter" Dralle "and others from engaging in the horrific behavior [in which he had] engaged in this case."

it indicates he "is unlikely to commit another offense," N.J.S.A. 2C:44-1(b)(9), the court noted that Dralle "grew up in a good and strong family" and "did well in school, especially in athletics" but "[s]omehow he went adrift from his strong family morals and principles he seemed to embrace in his youth." The court observed that Dralle's "bad judgment . . . exercised here is characteristic of him generally" but that "[h]e is remorseful." The court further found "that upon release from State Prison . . . with the support of family and friends, he can be a productive and law-abiding citizen."

The court also found defendant's age as a mitigating factor in accordance with N.J.S.A. 2C:44-1(b)(14), which requires that a sentencing court consider whether a defendant was under twenty-six years of age at the time of committing the offense. The court noted that Dralle "is [twenty-three] years old and was only [twenty] when he committed this offense" and assigned mitigating factor fourteen, as well as mitigating factors eight and nine, "moderate weight."

We are satisfied the court properly evaluated the statutory factors based on "competent, reasonably credible evidence"—including, but not limited to, Dralle's relative youth under mitigating factor fourteen—and balanced those factors based on the specific facts presented by Dralle's case. Fuentes, 217 N.J. at 72. The court's determination the aggravating factors outweighed the

mitigating factors is supported by competent evidence, <u>M.A.</u>, 402 N.J. Super. at 370, and we otherwise find no basis to question the court's exercise of its discretion in imposing sentence, <u>Fuentes</u>, 217 N.J. at 70. In sum, defendant offers no basis in the record to conclude that the court abused its discretion by imposing a lengthy sentence for the very serious crimes for which he was convicted, and we otherwise determine the sentence imposed does not shock the judicial conscience. <u>Ibid.</u>

To the extent we have not addressed defendants' remaining arguments, we considered them and are satisfied they are without sufficient merit to warrant further discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

In A-2511-20, affirmed. In A-2056-20, affirmed in part, vacated in part, and remanded for resentencing. <u>See generally</u> <u>State v. Randolph</u>, 201 N.J. 330 (2012). We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2056-20